# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

*UNITED STATES OF AMERICA*
v.

**SHARON MARIE CLARK**
**JEFFREY SCOTT WILLIAMS**

REDACTED

**ELECTRONIC CRIMINAL COMPLAINT**

**CASE NUMBER:** 16-4336MJ-PCT-DMF

I, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

**Count 1**

**On or between March 8, 2016 and March 9, 2016, in the District of Arizona, within the confines of the Colorado River Indian Tribes Indian Reservation, Indian Country, the defendants, SHARON M. CLARK and JEFFREY S. WILLIAMS, non-Indians, did with malice aforethought, unlawfully kill C.W., an Indian, in violation of Title 18, United States Code, Sections 1152, 1111 and 2.**

I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the following facts: **See attached Affidavit incorporated herein by reference.**

Continued on an attachment sheet and made a part hereof: ☒ Yes ☐ No

REVIEWED BY: AUSA Patrick Schneider */s/patrick schneider*

_X_ Pursuant to 28 U.S.C. §1746(2), I declare that the foregoing is true and correct.

Elliott M. White, Special Agent, FBI
Complainant's Name and Title

[signature] 11/11/2016
Complainant's Signature Date

_X_ Sworn by Telephone

November 11, 2016, at 10:02 a.m.
Date/Time

Flagstaff, Arizona
City and State

Deborah M. Fine U.S. Magistrate Judge
Name & Title of Judicial Office

Deborah M Fine
Signature of Judicial Officer

16-4336MJ-PCT-DMF

DISTRICT OF ARIZONA

**REDACTED ELECTRONIC AFFIDAVIT**

I, Elliott M. White, being duly sworn, depose and state as follows:

## I. Background

1. Your affiant, Elliott M. White, is a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and has been so employed since April, 2015. Your affiant has more than 13 years of experience as a sworn law enforcement officer - military and federal. Your affiant is currently assigned to the Lake Havasu City Resident Agency, Phoenix Division, Arizona. In the course of my official duties, I am charged with the investigation of crimes occurring on the Colorado River Indian Tribes (CRIT) reservation, within the District of Arizona, including Murder, in violation of Title 18, United States Code, Section 1111. According to the United States Department of Interior, Bureau of Indian Affairs (BIA) Federal Register, the Colorado River Indian Tribes is a federally recognized Indian tribe, which is eligible to receive services from the BIA.

2. The information contained in this affidavit is based upon my personal knowledge, training, experience, and the investigation of other law enforcement officers including FBI SA Tracie Keegan, FBI SA Geoffrey Young, CRIT Police Department (PD) Detective Erik Schneider, CRIT PD Criminal Investigator Charlie Solano, and CRIT PD Officers. I have not included each and every fact known to me concerning this

investigation. I have set forth only the facts necessary to establish probable cause to support issuance of the requested arrest warrant.

3. On or between March 8, 2016 and March 9, 2016, in the District of Arizona, within the confines of the Colorado River Indian Tribes Indian Reservation, Indian Country, the defendants, Sharon M. Clark and Jeffrey S. Williams, non-Indians, did with malice aforethought, unlawfully kill C.W., an Indian, in violation of Title 18, United States Code, Sections 1152, 1111 and 2.

**II. Investigation**

4. On Wednesday, March 9, 2016, at approximately 7:38 a.m., Detective Schneider contacted SA Keegan regarding the body of a deceased female discovered floating in a canal located off of Patrick Road near Mohave Road, in Poston, Arizona. This area is located approximately 13 miles south of the town of Parker, Arizona, and is located within the exterior boundaries of the CRIT reservation.

5. On March 9, 2016, SA Keegan contacted the Mohave County Medical Examiner's Office to schedule the retrieval of the body after the scene had been processed.

6. Detective Schneider contacted SA Keegan after the CRIT Fire Department retrieved the body from the canal. Detective Schneider advised that the female had duct tape over her mouth, ligature marks on both her wrists and ankles, and multiple lacerations to her abdomen and lower left leg. The victim's pants and underwear had been pulled down around her ankles. The victim had a Japanese or Chinese symbol tattooed on her upper right arm, and the words, "Joe Jim's" tattooed on her lower back. SA Keegan and

SA White immediately responded to the CRIT reservation to initiate a joint investigation with CRIT PD.

7. On March 9, 2016, SA Keegan and SA White arrived on scene, and conducted an assessment. The victim's eyebrows and portions of the hair bordering her face appeared to have been shaved with an electric hair trimmer. Agents also observed that duct tape had been around the victim's mouth and face area. The duct tape is described as the colors of a rainbow with zebra stripes. It was also noted that the victim was missing one (1) of her silver in color hoop earrings. SA Keegan and Detective Schneider processed the crime scene where the body had been removed from the canal, which included photographs of the victim, the scene, and her personal effects which had been recovered from the canal. The victim's cellular telephone was not recovered. The victim's purse was located in the canal, but no wallet or identification cards were uncovered. The body was removed from the scene by the Mohave County Medical Examiner's Office.

8. On March 9, 2016, SA White and CRIT Police Officer Joey Burnett processed the area of the canal where it was believed that the victim had been dumped into the canal. This was based upon a substance appearing to be blood on the cement embankment of the canal in several spots, along with tire-tread impressions, and footwear impressions. These impressions were preserved for comparison purposes. Additionally, a broken black hair band had been located on the dirt embankment of the canal which was similar to the black hair bands observed around the victim's right wrist. This area is

identified as the canal, southwest of Indian School Road, near station 420 (canal head gate), Poston, Arizona. This location is approximately 5.54 miles upstream of the location where the body was recovered. This location is also within the exterior boundaries of the CRIT reservation.

9. On March 10, 2016, at 6:54 a.m., Detective Schneider contacted SA Keegan and advised that he made a tentative identification of the victim. Detective Schneider advised that R.M., contacted CRIT PD on the evening of March 9, 2016, and stated he had not seen his sister in two days. R.M. identified his sister as 41 year old C.W., an Indian female, whose last known address was in Parker, Arizona. Detective Schneider obtained a photograph of C.W., and noted that C.W. looked similar to the victim. Additionally, Detective Schneider obtained a CRIT Adult Detention Center booking photograph which documented C.W.'s tattoos. The victim's tattoo matched C.W. tattoos.

10. On March 10, 2016, SA White and Detective Schneider made a positive identification of the victim with family members, confirming the identity of the victim as C.W.

11. On March 10, 2016, SA White conducted a query of the National Comprehensive Database for C.W.'s cellular telephone number (928)216-0767, and learned that the service provider for that cellular telephone number was Verizon Wireless, 180 Washington Valley, Bedminster, New Jersey 07921. SA White learned through Verizon that the last cellular telephone usage for that cellular telephone was Tuesday, March 8, 2016 at 1:24 p.m.

12. During the course of this investigation more than eighty (80) interviews were conducted. All of the individuals interviewed were asked about their last contact with C.W. It was learned through multiple interviews that C.W. had been telling family and friends that she had been cleaning houses to earn money, but this was actually a front for prostitution. Additionally, C.W. was described as transient, and had been involved in selling drugs. It was also learned that shortly before her disappearance, C.W. contacted various individuals advising that she was "Up River" cleaning a house, and needed a ride. It should be noted that "Up River" is further identified as the area north of the town of Parker, Arizona, within La Paz County.

13. On March 10, 2016, SA White and Detective Schneider interviewed R.M. R.M. stated the last time he had heard from C.W. was on Monday, March 7, 2016 via her cellular telephone, (928)216-0767. R.M. stated that approximately two months ago, a male individual that lived at a house on 1st Avenue and Burns Road in Parker, Arizona asked C.W. to drive a truck loaded with dope to Kingman, Arizona. Later, C.W. told R.M. that the man attempted to rape C.W. C.W. told R.M. that when she was at the house on 1st Avenue and Burns Road in Parker, Arizona, C.W. could hear that they had someone tied up.

14. On March 11, 2016, SA White and Detective Schneider interviewed E.H. E.H. advised she is a close friend of C.W. It was learned that prior to her death, C.W. had been staying at M.G's house located in Parker, Arizona. Investigators interviewed everyone who had been staying at M.G.'s house at the time of C.W.'s disappearance

including E.H. E.H. said the last time she saw C.W. was when she dropped her off at a house "Up River" on Tuesday, March 8, 2016, at approximately 4:00 a.m. or 5:00 a.m.

15. On March 11, 2016, SA White and Detective Schneider interviewed P.S. who had been residing at M.G.'s house at the time of C.W.'s disappearance. P.S. stated that recently C.W. had been at M.G.'s house when an Indian male named T.B., and a white male named Scott, last name unknown, came to the house looking for C.W. P.S. stated that C.W. hid in the house, and she had told P.S. to tell them she was not there. P.S. stated that C.W. told him that she owed the men $400.00, and that the men lived at the corner of 1st Avenue and Burns Road in Parker, Arizona.

16. On March 12, 2016, SA Keegan and Detective Schneider attended the autopsy of C.W. conducted by Dr. Rexene Worrell, Mohave County Medical Examiner, in Lake Havasu City, Arizona. Following the post mortem examination on March 12, 2016, SA Keegan collected items of evidence from C.W.'s body, including clothing, fingernail clippings, a head hair sample, a DNA sample, and buccal swabs.

17. On March 14, 2016, SA White and Detective Schneider interviewed K.S. K.S. is a friend of C.W. K.S. stated that the last time she saw C.W. she had dropped her off at a house "Up River" on Sunday, March 6, 2016, at approximately 9:00 p.m. or 10:00 p.m. K.S. assisted SA White and Detective Schneider with identifying the house where she dropped C.W. off by escorting them to the residence. The residence was identified as 9479 Hilltop Drive, Parker, Arizona 85344. This is "Up River" and within La Paz County.

18. On March 14, 2016, SA White and Detective Schneider interviewed A.A., who resides at 9479 Hilltop Drive, Parker, Arizona, cellular telephone number (928)287-6733. A.A. stated that he knew C.W. as a friend of his wife, M.B. A.A. stated his wife had been out of town, and C.W. came over to clean his house. A.A. advised that the last time he saw C.W. was on Thursday, March 10, 2016 (It should be noted that C.W.'s body had been recovered on March 9, 2016 at 7:10 a.m.) A.A. stated C.W. came over that morning to clean his house, and that he left for work. A.A. advised that when he had returned home from work C.W. was gone. A.A. denied having a sexual relationship with C.W.

19. On March 16, 2016, in an attempt to identify the "Scott" who had been referenced in a previous interview, who lived at a residence located at 1st Avenue and Burns Road, Parker, Arizona, SA White and Detective Schneider interviewed T.G. T.G. was asked if he knew the neighbors who lived at the corner of 1st Avenue and Burns Road, Parker, Arizona. T.G. advised that a male named "Scott" lived at the house. T.G. stated that a male named "Burton" lived in a trailer behind the house. The residence T.G. had been referring to where "Scott" lived was identified as 26947 East Burns Road, Parker, Arizona.

20. On March 16, 2016, SA White and Detective Schneider interviewed E.W. who lives at 26947 Burns Road [1st Avenue and Burns Road] Parker, Arizona. E.W. stated she currently lives alone at that address. E.W. stated that her ex-husband, Jeffrey Scott Williams, white, male, who goes by the name of Scott Williams, did not live there,

but he would often visit. Jeffrey Scott Williams will hereinafter be referred to as "S.W." E.W. stated that S.W. lives with his girlfriend, Sharon Clark, hereinafter referred to as "S.C.", at the CRIT Lodge, in Parker, Arizona. It should be noted that the CRIT Lodge is further identified as 13100 1st Avenue, Parker, Arizona. This location is within the exterior boundaries of the CRIT Reservation. E.W. stated that T.B. did not live on her property, which is inconsistent with the neighbors stating that T.B. lived in the trailer behind her house. E.W. advised that she and S.W. knew C.W. E.W. stated that C.W. had visited her house, and C.W. had been friends with E.W.'s son.

21. On March 25, 2016, SA Keegan and CI Solano interviewed S.L., an Assistant at the CRIT Lodge. S.L. was informed that investigators were attempting to locate S.W., who had allegedly been staying with S.C. at the CRIT Lodge. S.L. was asked for S.C.'s apartment number. S.L. stated that S.C. was staying in Apartment 23 of the CRIT Lodge. S.L. advised they had received several complaints from other tenants that a white male had been staying with S.C., and he was not on the lease. S.L. was asked to describe the white male who had been staying with S.C. S.L. stated he was skinny and he had curly brown hair. S.L. added that the male drove a big brown truck.

22. SA Keegan and CI Solano attempted to make contact with S.C. with negative results, as no one answered the front door. A brown truck was observed parked in front of S.C.'s apartment. SA Keegan ran a registration query of the license plate on the truck, Arizona registration CJ44332. The truck was registered to S.W. with an address of a Post Office Box in, Parker, Arizona. The vehicle is described as a 1989, Ford 1 ton pick-up

truck, two tone dark brown over light brown, with a camper shell on the back. The truck also had dually tires on the back.

23. On March 25, 2016, SA Keegan and CI Solano interviewed M.K., who was friends with C.W. M.K. advised that C.W. had recently stayed with her, and she noticed that C.W. appeared to be scared of someone or something. M.K. stated that C.W. made sure the front door was locked at all times, and always looked at vehicles which passed the house. M.K. added that C.W. cleaned house for "Scott, last name unknown" who lived with his wife on 1st Avenue in Parker, Arizona. M.K. stated that C.W. acted like "she had to be there," like "she owed them something." M.K. advised that "she figured it was drugs." M.K. stated that C.W. always had either a black duffle bag, or a black backpack with her at all times.

24. On March 25, 2016, SA Keegan and CI Solano interviewed S.W. in the Walmart parking lot in Parker, Arizona. S.W. stated he lived at the CRIT Lodge with S.C. S.W. denied that he and S.C. were in a relationship, and stated they were just "friends." S.W. stated he had known C.W. for approximately four (4) years as C.W. had been friends with his stepson. S.W. advised C.W. would often visit his house and did house work for money. S.W. stated that C.W. "always needed money." S.W. was advised that individuals interviewed said that C.W. had owed him money. S.W. stated that "she [C.W.] would always borrow money, but I never expected to get it."

25. S.W. was asked if he knew an individual by the name of A.A. S.W. advised that he did know A.A., as A.A. hired him to do some work for him, and he recently sold a

pick-up truck to A.A. S.W. was asked if he had ever been to A.A.'s house, and he stated he had. S.W. advised that he had last been to A.A's house approximately two or three weeks ago to assist A.A. with a job. S.W. was asked if he had ever observed C.W. at A.A.'s house, and he stated he didn't think so. S.W. was asked if that was a yes or no response, and he stated, "no." S.W. was asked if C.W. had ever been to the apartment that he shares with S.C., and he stated, "no." S.W advised he had not seen C.W. in months. S.W. denied that C.W. sold drugs for him and he denied physically harming C.W.

26. On March 30, 2016, CI Solano had been notified by the Parker Police Department that an individual wanted to provide information on C.W.'s murder. CI Solano had been given the name of L.Z., who lives at the CRIT Lodge in Parker, Arizona.

27. On March 30, 2016, SA Keegan and Detective Schneider interviewed L. Z. in an FBI vehicle in the La Paz Regional Hospital parking lot, Parker, Arizona. L.Z. stated that she used to be friends with S.C. who also lives at the CRIT Lodge with her boyfriend S.W. L.Z. advised that she had a conversation with S.C. where S.C. had told her that C.W. owed money to S.W., and that S.C. had been looking for C.W. L.Z. stated S.C. had shown her pictures on her cellular telephone of houses where S.C. believed C.W. had been living. L.Z. stated it appeared that S.C. was stalking C.W. L.Z. stated that S.C. told her that she "smacked" C.W. with some brass knuckles, and that C.W. had fallen and hit her head on the floor which had knocked her unconscious. S.C. told L.Z. that she did not believe C.W. was dead, but she called "some guys to take her [C.W.] out of there." L.Z. stated a couple of days later she saw C.W.'s murder in the local newspaper. L.Z. was

asked if S.C. mentioned S.W.'s involvement in C.W.'s murder. L.Z. recalled S.C. stating that "Scott had seen her [C.W.]." L.Z. understood this to mean that S.W. brought C.W. to S.C.'s apartment. L.Z. stated it was her understanding that C.W.'s murder started in S.C.'s living room area, and that blood was all over the place. L.Z. was asked what type of flooring was in S.C.'s apartment. L.Z. advised there is no carpet, it's tile floor.

28. L.Z. stated she had recently been picked up for a ride by J.M., who is a Transit Worker for La Paz County. L.Z. stated J.M. had told her that S.C. had also been "going on" about beating up C.W., and having a guy take her [C.W.] somewhere.

29. On March 30, 2016, SA Keegan and Detective Schneider interviewed S.C., white, female, outside her apartment at the CRIT Lodge, Parker, Arizona. S.C. stated she did not know C.W. S.C. was asked what her relationship was with S.W. S.C. described her relationship with S.W. as "fuck buddies." It should be noted that this is inconsistent with S.W.'s statement that he and S.C. were only friends. S.C. was asked about the comments she had made to others about assaulting C.W. S.C. stated, "when I'm not in this [wheelchair] I have to use a cane." S.C. was specifically asked if she had assaulted C.W., and she stated, "no." S.C. was asked if she had told people that she had done these things, and she stated, "didn't do that, didn't say that." S.C. then stated, "first of all I wouldn't know who to call [to get rid of the body]." S.C. was advised that investigators had heard that she had beat up C.W. because C.W. owed money to S.W. S.C. stated, "didn't happen."

30. It should be noted that during this investigation, investigators conducted a neighborhood canvass around the last known whereabouts of C.W., in particular, A.A.'s residence on Hilltop Drive, Parker, Arizona. One of the neighbors interviewed had been J.L. J.L. had provided information about seeing a woman, believed to be C.W., being dropped off at A.A.'s house. J.L. stated the woman he observed had been wearing stiletto heels, and had been carrying a black bag.

31. On April 7, 2016, SA White executed a search warrant, issued by the United States District Court, District of Arizona, Flagstaff, upon Verizon Wireless for C.W.'s cellular telephone records. On April 14, 2016, SA White received the requested telephone records from Verizon Wireless. SA Keegan submitted the telephone records to SA Geoffrey Young, FBI Phoenix Office, for cellular analysis of the records provided by Verizon Wireless.

32. On April 17, 2016, SA Keegan received the Certificate of Indian Blood from the Colorado River Indian Tribes Enrollment Office, Parker, Arizona, documenting that C.W. is an enrolled member of the CRIT.

33. On April 27, 2016, SA Keegan received the cellular analysis of C.W.'s telephone records which had been conducted by SA Young. The analysis documented that C.W.'s telephone had been utilized on March 8, 2016 utilizing two (2) different cell towers. The analysis documented that on March 8, 2016, from 5:17 a.m. through 12:54 p.m. C.W.'s cellular telephone had been detected on a cellular tower which covers the area referred to as "Up River." The analysis then documented that the last two (2) telephone

calls made to/from C.W.'s cellular telephone were from a different cell tower which covers Parker, Arizona. This would indicate that C.W.'s cellular telephone had moved south from "Up River" in La Paz County, Arizona, to the town of Parker, Arizona, which is located within the exterior boundaries of the CRIT reservation.

34. On April 29, 2016, SA Keegan and Detective Schneider interviewed L.W. L.W. is C.W.'s sister. L.W. stated that C.W.'s cellular telephone had been a light gray in color, Verizon flip phone.

35. On May 3, 2016, SA Keegan and Detective Schneider interviewed K.S, a second time. SA Keegan asked K.S. if she was aware if C.W. had owed money to anyone. K.S. advised she had heard that C.W. had owed money to M.S., and S.W. K.S. stated that S.W. had a drug connection in Indio, California.

36. On June 2, 2016, SA White interviewed I.B. at the FBI Office in Lake Havasu City, Arizona. I.B. stated that C.W had owed money to a man named "Scotty."

37. On June 2, 2016, SA White and CI Solano were present and observed a forensic interview of Jane Doe hereinafter referred to as "Doe" conducted by Forensic Interviewer Carli Moncher of the Safe Child Center of the Flagstaff Medical Center. Doe is the daughter of P.S. and was residing at M.G.'s house when C.W. was found in the canal. The interview was conducted at the FBI Resident Agency in Lake Havasu City, Arizona.

38. During the interview, Doe stated that while at M.G.'s residence, C.W. told Doe that she was worried about her son because he stole money from a male with cowboy boots and a white truck. Doe stated that the male came looking for C.W. C.W. told Doe

to answer the door, but to tell the male that C.W. was not there. Doe stated that the male wore a knife on his right side and was wearing a mask like the one on the movie Halloween. The male asked if C.W. was home, but Doe said she was not there. At the time, C.W. was hiding in the garage. The male came back later that day around 10:00 p.m., and Doe answered the door. The male asked for C.W again, and said to tell her that he was going to kill her if he saw her. C.W. told Doe a story about the male. C.W. told Doe that she had gone to the male's house, and he had slammed her head against the table and gave her a scar. That time, he held her hostage for three hours. C.W. told Doe that when she was at the male's house, there was a girl with long hair tied up in a chair, and yelling "help me he is keeping me hostage". C.W. got her out and left. C.W. said that the male came from California. C.W. told Doe that the male really wanted to kill her and told her he would dump her in the canal. C.W. said the male lived on 1st Avenue and Burns Road.

39. On June 14, 2016, SA Keegan, SA White and CI Solano interviewed J.M., the driver of the transport van previously mentioned by L.Z. J.M. stated that she had read about C.W.'s murder in the Parker Pioneer newspaper. J.M. advised that sometime after reading the paper, she had picked up S.C. to give her a ride in Parker, Arizona. J.M. stated she does not know which one of them started the conversation, but she and S.C. discussed the murder of C.W. J.M. stated that S.C. said, "I'm the one who told the guys she [C.W.] was a snitch." J.M. stated she asked S.C., "how do you know?" J.M. advised S.C. told her, "I've known her, and S.W. knows her." J.M. stated that S.C. had told her she was the

one who had put the duct tape on her [C.W.'s] mouth. J.M. advised S.C. also stated, "they took her out of the apartment, I didn't know they were going to kill her." J.M. stated she did not believe anything S.C. had been saying, and became argumentative with her.

40. J.M. stated that "probably the next day" she had picked up S.C. again for a transport. J.M. stated, "she had the duct tape with her." J.M. had explained that S.C. had been making bras out of designer duct tape. J.M. stated for Christmas 2015, she had bought three (3) rolls of designer duct tape, and had gifted them to S.C. J.M. was asked the colors of the rolls of duct tape she had gifted to S.C. J.M. stated that one roll was pink with sparkles, one roll was gray with sparkles, and one roll had been zebra striped with yellow and gray. J .M. stated she had purchased the duct tape at the Dollar General Store in Parker, Arizona. J.M. stated that S.C. stated she had to get rid of the duct tape, and threw the roll of duct tape out the window as they had been driving down the road. J.M. was asked which roll of the duct tape S.C. had thrown out the window. J.M. stated that it was the roll of duct tape which had been zebra striped. J.M. showed investigators the area where S.C. had thrown the duct tape out the window. However, investigators did not locate the roll of duct tape.

41. Investigators escorted J.M. to the Dollar General Store in Parker, Arizona to identify the particular roll of duct tape she had gifted S.C., and the one S.C. had subsequently thrown out the window of the transport van. J.M. stated the exact design of the roll of duct tape was not currently in the store. SA White pointed out a display which depicted a roll of duct tape with zebra stripes and rainbow colors, which investigators were

aware had been found on C.W.'s body. J.M. stated that was not the color of zebra striped duct tape she had given to S.C. Investigators opined that S.C. may still have the particular roll of duct tape in her possession which had been used on C.W.'s body at the time of her death.

42. J.M. stated that during one of the two times she had talked with S.C. about C.W., she recalled telling S.C. that she had read in the newspaper that C.W. had last been seen "Up River" prior to her death. J.M. stated S.C. had responded that "they" had brought C.W. from "Up River" to S.C.'s apartment.

43. J.M. stated she had a subsequent interaction with S.C. in the transport van. S.C. had told J.M. that L.Z. had turned her in to the FBI. J.M. stated that S.C. then told her that she had never met C.W., and that S.W. only met C.W. one time. J.M. stated, she yelled at S.C., "that's not what you told me!" J.M. stated she had continued to argue with S.C. as S.C. was now saying that she never met C.W. which is inconsistent with her prior statements.

44. On July 8, 2016, SA White served federal grand jury subpoenas upon Verizon Wireless requesting cellular telephone records for S.C.'s cellular telephone number (928)444-3704, and S.W.'s cellular telephone number (928)216-6888.

45. On July 11, 2016, SA White received the requested cellular telephone records for S.W. from Verizon Wireless.

46. On July 12, 2016, SA White received the requested cellular telephone records for S.C. from Verizon Wireless.

47. On July 18, 2016, SA Keegan and Detective Schneider interviewed a Confidential Human Source, hereinafter referred to as "CHS." CHS stated that the CHS knows S.C. CHS stated that S.C. uses and sells "weed, meth, and the date drug." CHS stated that S.C. lives at the CRIT Lodge with her boyfriend, S.W. CHS stated that S.W. is married to another woman who lives at 1st Avenue and Burns Road, Parker, Arizona, but he had been living with S.C. for the past year. CHS stated that S.W. drives a two tone brown truck, with dually tires, and a camper shell on the back. CHS stated that S.W.'s truck used to have a back seat in it until C.W. had gone missing. CHS advised that there is no longer a back seat in S.W.'s truck.

48. CHS stated that approximately three (3) weeks prior to C.W.'s death, CHS had a conversation with S.C. S.C. told CHS that while at her apartment she walked into her living room at approximately 1:00 a.m. or 2:00 a.m. S.C. had described to CHS that she observed S.W. sitting down, and C.W. was leaning over him. CHS stated that S.C. had indicated to CHS that S.W. and C.W. were engaged in a drug deal. S.C. told CHS that she yelled at S.W., "what's that bitch doing here?" S.C. told CHS that S.W. told her that C.W. was there to buy something [drugs]. S.C. told CHS she told S.W., "she's going to burn you again." S.C. told CHS that S.W. responded, "I'm gonna sell to her one time." S.C. told CHS she had told S.W., "I know she's going to burn you." S.C. told CHS that she walked out of the room, stopped, turned and told C.W. "I'm gonna kill your ass if you burn him." CHS stated it was CHS's understanding from talking to S.C. that C.W. had

been given one week to pay S.W. back the $1,000 worth of marijuana she had received from him.

49. CHS stated that a week later CHS had another conversation with S.C. CHS stated that C.W. had not paid S.W. back the money she owed him. CHS advised S.C. told CHS, "I'm gonna get this bitch!" CHS stated S.C. also stated, "I'm gonna cut this bitch up!"

50. CHS stated S.C. told CHS that she had taken $1,000 out of her own account, and had given the money to S.W. CHS advised that S.C. had told CHS that when she had given S.W. the money he had asked what the money was for. CHS stated S.C. had told CHS she had told S.W., "I bought her contract." S.C. also told S.W., "my problem now, not yours." CHS stated S.C. then started talking to CHS and telling CHS what she was going to do to C.W. S.C. had told him, "I could use duct tape on her hands." CHS advised S.C. also mentioned that she could use plastic zip ties to bind her [C.W.'S] hands, and then said, "I'm gonna fuck her up!"

51. CHS stated that the CHS believed at the time that S.C. was "just talking" but CHS did feel a little concerned. CHS stated CHS had told two (2) females who knew C.W. to tell her to "watch her back."

52. CHS stated approximately one week later CHS had another conversation with S.C. where S.C. had told CHS that she had been out looking for C.W. S.C. told CHS that she brought a gun with her, and had her knife in her boot. CHS was asked if S.C. has a knife. CHS stated S.C. had a black in color butterfly knife, and CHS has seen her with

the knife. CHS had seen S.C. with a .44 magnum. CHS advised S.C. also said she has a .38 caliber revolver, but CHS had never seen the revolver.

53. CHS stated when CHS later learned that C.W.'s body had been found CHS's "hair went up." CHS stated that the day CHS found out about C.W.'s death, CHS secretly walked by S.W.'s truck, which was parked outside of S.C.'s apartment. CHS observed mud on the tires, and CHS is aware that S.C. and S.W. disappeared for three days after C.W.'s body had been found. CHS stated that since then CHS had been trying to get word to the investigators about what CHS had heard from S.C.

54. CHS stated after C.W.'s homicide, CHS had another conversation with S.C. CHS stated S.C. was aware that L.Z. had talked to the FBI. S.C. had told CHS, "I don't care if they pick up that skinny bitch, you're the only one that knows anything." CHS stated S.C. then said, "you're the one I'm worried about." CHS indicated CHS is fearful of S.C. CHS told investigators, "you know it wasn't about the weed." CHS explained that S.C. was jealous of C.W., and it had nothing to do with C.W. not paying her drug debt to S.W.

55. On August 2, 2016, SA Keegan received the autopsy report from Doctor Rexene Worrell, Mohave County Medical Examiner, Lake Havasu City, Arizona, for C.W. Dr. Worrell listed the date of death as March 9, 2016, at 7:10 a.m., which was when C.W.'s body had first been observed in the canal. The cause of death was documented as asphyxia due to drowning. Multiple blunt force injuries were considered to be a significant contributing factor in her death. The manner of death was documented as a

homicide. Dr. Worrell further documented her anatomical diagnosis: 1) asphyxia due to drowning, duct tape over mouth – ligature marks about both wrists; 2) multiple non-fatal stab and incised wounds involving the abdomen and extremities – Fourteen (14) in total - ten (10) incised wounds, four (4) stab wounds. Dr. Worrell also documented that three (3) of the fourteen (14) wounds are considered defensive wounds; 3) Blunt force injuries of the head and mouth; 4) Scraping abrasions consistent with a body in water.

56. On August 13, 2016, SA Keegan conducted a review of the requested Verizon Wireless cellular telephone records for both S.C and S.W. The review documented that on March 8, 2016 when C.W. had reportedly been dropped off at A.A.'s residence "Up River" at 4:00 a.m. or 5:00 a.m., A.A. made multiple telephone calls to S.W. beginning at 6:39 a.m. It was also noted that S.W, called S.C. at 12:17 p.m., and again at 2:06 p.m. which is near the time when C.W.'s cellular telephone stopped registering off of cell towers on March 8, 2016 at 1:24 p.m. There are documented telephone calls throughout the day between A.A., S.W, M.B, and S.C.

57. On September 2, 2016, U.S. Magistrate Judge Deborah M. Fine, District of Arizona, Flagstaff, Arizona, issued three (3) search warrants for the cellular telephone records (content) of S.W., (928)216-6888; S.C., (928)444-3704; and A.A., (928)287-6733, to be served upon Verizon Wireless.

58. On September 2, 2016, SA Keegan served the three (3) search warrants upon Verizon Wireless.

59. On September 4, 2016, SA Keegan received the requested records from Verizon Wireless for cellular telephone numbers (928)216-6888 and (928)444-3704. SA Keegan forwarded the records received from Verizon Wireless to SA Young for cellular telephone analysis.

60. On September 9, 2016, SA White and SA Keegan received the cellular analysis of S.C.'s and S.W.'s telephone records which had been conducted by SA Young. The analysis documented that S.C's telephone had been utilized between March 8, 2016 at 2:06 p.m. and March 9, 2016 at 5:31 a.m. utilizing one (1) cell tower/sector which covers Parker, Arizona. This would indicate that S.C.'s cellular phone was in the town of Parker, Arizona during this time period. It should be noted that S.C.'s apartment located at 13100 1st Avenue, Parker, Arizona is located within the area covered by this cell tower/sector.

61. The analysis also documented that S.W's telephone had been utilized between March 8, 2016 at 1:14 p.m. and March 9, 2016 at 06:45 a.m. utilizing three (3) different cell towers/sectors. The analysis documented that most of the telephone calls made to/from S.W.'s phone occurred utilizing the tower/sector that covers the town of Parker, Arizona. The analysis documented that two (2) telephone calls made to/from S.W.'s cellular telephone were from the cell tower which covers "Up River". These calls occurred at 2:06 p.m. and 4:03 p.m. The analysis also documented that two (2) telephone calls made to/from S.W.'s cellular telephone were from a cell tower/sector which covers an area south and west of Parker, Arizona. These telephone calls occurred on March 9, 2016 at 2:14 a.m. and 2:43 a.m. This would indicate that S.W.'s cellular telephone had moved

south from Parker, Arizona. It should be noted that the location where agents suspect that C.W's body was dumped into the canal is approximately 5 miles south-west of Parker, Arizona, and is within the area covered by the same cell tower and sector.

62. On September 27, 2016, SA White learned from CHS that the floor in 13100 1st Avenue, Apartment 23, Parker, Arizona consists of tile and grout.

63. On September 27, 2016, SA Keegan, SA White, and CI Solano interviewed Y.A. at her residence in Vidal, California. Y.A. stated she had first met S.C. when Y.A. worked at the 76 gas station in Parker, Arizona. Y.A. estimated that she worked at the gas station from 2013 until April 2016. Y.A. advised she first met S.C. as a customer at the gas station. Y.A. stated that S.C.'s husband was dying, and she comforted S.C. during that time. Y.A. advised that S.C. was "off the wall" with some "mental issues." However, Y.A. stated she did not initially fear S.C. until S.C. had told her that she killed C.W.

64. Y.A. was asked to describe the circumstances in which S.C. confessed to C.W.'s murder. Y.A. described an incident with S.C. which happened prior to S.C. talking about C.W.'s murder. Y.A. advised that approximately a "couple of weeks" prior to S.C. confessing to the murder, S.C. either called her or sent her a text message. Y.A. is not exactly sure if it had been a call or a text message. Y.A. advised, S.C. told her that the "little red headed bitch went to the FBI, and said S.C. had something to do with the murder." Y.A. stated she did not know the name of the "little red headed bitch" S.C. had been referring to, but she is aware of who she is, and that she also lives at the CRIT Lodge with S.C. Y.A. stated she's a "tiny thing." Y.A. stated that she had heard about the

murder of C.W. at the store, but she did not know her personally.

65. Y.A. was asked how she had responded to S.C. Y.A. stated she responded, "you're kidding?" Y.A. advised S.C. then told her that the FBI had questioned her, and she told the FBI that she didn't do it. Y.A. stated she didn't put much thought into the discussion with S.C. at the time, but that changed when S.C. later confessed to her. Y.A. stated that during this first incident she did not think that S.C. was capable of murder.

66. Y.A. stated that she quit working at the 76 gas station in April 2016. So, either at the end of April 2016, or the beginning of May 2016, she went over to S.C.'s apartment. Y.A. was asked if she had been to S.C.'s apartment before, and she stated, "yes." Y.A. was asked where S.C. lived. Y.A. stated S.C. lived at the CRIT Lodge, Apartment 23, which is on 1st Street, Parker, Arizona. Y.A. stated she went over to S.C.'s apartment in the evening.

67. Y.A. was asked who was in S.C.'s apartment when she had arrived. Y.A. stated S.C., and her boyfriend, Scott. Y.A. stated she does not know Scott's last name. Y.A. was asked to describe Scott. Y.A. described Scott as a white male, tall, skinny, curly hair, and was in his early 50's. Y.A. stated that Scott lives at the apartment with S.C. Y.A. stated that Scott left his wife for S.C. Y.A. was asked how long Scott had lived with S.C. Y.A. stated that S.C. had got together with Scott right after S.C.'s boyfriend died. Y.A. was asked if S.C.'s partner who had died had been her husband, or boyfriend. Y.A. believes he was S.C.'s boyfriend. Y.A. estimated that S.C. and Scott lived together for maybe a year. Y.A. stated Scott does not work.

68. Y.A. stated she was sitting on S.C.'s bed talking with S.C. and Scott. Y.A. stated at some point Scott got up, and went into the living room to get on the computer. Y.A. stated S.C. then told her, "I killed her, I killed that girl." Y.A. advised that S.C. did not mention C.W.'s name, but she knew who S.C. was referring to based upon the earlier communication with S.C. Y.A. then described that S.C. started crying and shaking. Y.A. stated that Scott deals methamphetamine all the time out of the apartment. Y.A. was asked if she knows who sells the drugs besides Scott. Y.A. stated, S.C. Y.A. stated she is aware that S.C. and Scott have guns in the apartment, and she is aware they have an AK-47. Y.A. stated she is aware that they hide their weapons in a crawl space in the bedroom closet.

69. Y.A. was advised that investigators are aware that S.C. uses a wheelchair. Y.A. chuckled, and stated that S.C. limps, but she walks for miles and miles without that wheelchair. Y.A. advised that S.C. can freely walk around without the wheelchair. Y.A. was asked if she knew S.C.'s condition which required a wheel chair. Y.A. stated that S.C.'s condition had something to do with her back.

70. On October 17, 2016, CHS contacted SA White and advised that S.C. and S.W. had a falling out, and S.W. is not currently living with S.C at the CRIT Lodge. S.W. is living at his house on 1st Ave and Burns Road. CHS advised that on October 17, 2016, S.C. told the CHS that she sold the AK, but still has a .44 caliber revolver and keeps it in a gun box in the residence.

71. SA Keegan requested criminal history records for S.C. According to the

criminal history, S.C. was convicted of a felony, Assault with a Deadly Weapon in Barstow, California on January 18, 1996.

72. SA Keegan requested criminal history records for S.W. According to the criminal history, S.W. was convicted of a felony, Disorderly Conduct-With a Deadly Weapon or Dangerous Instrument in La Paz County, Arizona on December 6, 2010.

73. Based on your affiant's training and experience, your affiant is aware that S.C.'s and C.W.'s felony convictions prohibit them from possessing firearms or ammunition.

74. On October 17, 2016, SA White spoke with Forensic Examiner Brandon McCollum of the DNA Casework Unit at the FBI Laboratory in Quantico, Virginia. McCollum advised that DNA evidence in the form of dried blood and touch DNA could still be collected from an apartment with tile and grout flooring years after a stabbing occurred. McCollum further advised that it is still possible to collect biological material which can provide DNA evidence from a location such as the apartment even if efforts were made to clean up the DNA after the stabbing occurred.

75. On November 4, 2016, U.S. Magistrate Judge Deborah M. Fine, District of Arizona, Flagstaff, Arizona, issued a search warrant to search the premises of 13100 1st Avenue, Apartment 23, Parker, Arizona.

76. On November 10, 2016, FBI Evidence Response Team members conducted a search of 13100 1st Avenue, Apartment 23, Parker, Arizona. During the search, multiple

items were seized including: black hair clippers, suspected blood and hair from the living room ceiling, brass knuckles, suspected methamphetamine, firearms, and multiple knives.

77. On November 10, 2016, S.C, was interviewed by SA White and CRIT PD CI Solano in SA White's FBI service vehicle outside of 13100 1st Avenue Apartment 23, Parker, Arizona. The interview was being conducted while a search was being conducted of S.C.'s apartment.

78. At approximately 7:32 a.m., S.C. was advised of her rights under Miranda, via the FBI Advice of Rights form (FD-395). The form was read aloud to S.C. At approximately 7:33 a.m., S.C. signed the waiver portion of the form, indicating that she understood her rights and agreed to waive those rights.

79. After being advised of the identity of the interviewing agent/investigator and the nature of the interview, S.C. provided the following information: S.C. was asked about her relationship with S.W. S.C. described S.W. as her "fuck buddy" and said that S.W. has an ex-wife. S.W. lives at both S.C.'s apartment and with his ex-wife. S.W. is over at S.C's apartment every day.

80. S.C. was asked about her involvement with the death of C.W. S.C. stated that she had never met C.W. S.C. said that C.W. was never at her apartment. S.C. said that she had only sent one or two texts to C.W. stating "woman up and pay" S.C. said that C.W. owed S.W. money. S.C. did not know how much money C.W. owed S.W.

81. S.C. was asked multiple times about her knowledge of the death of C.W. S.C. stated multiple times she did not know anything about it, and she did not believe that S.W. was involved.

82. Investigators told S.C. that S.W. had confessed to S.W.'s and S.C.'s involvement in C.W.'s murder. S.C. then stated the following about the incident:

83. S.C. stated that S.W. received a call from A.A. one morning. S.C. and S.W. drove up to A.A.'s house in S.W.'s truck and picked up C.W. S.W. was riding in the area of the truck where the back seat would be. S.C. said during the ride back to Parker, Arizona, C.W. was fine. S.C. and S.W. took C.W. to S.C.'s apartment.

84. Once at S.C.'s apartment, S.W. and C.W. were arguing, and S.W. placed zip ties on C.W. S.C. could not remember where the ties were placed. S.C. said she could not remember everything about what happened, but she remembered that C.W. was laying face down on the floor. C.W. was not yelling. S.C. was asked if C.W. was crying. S.C. said she was probably crying. S.C. said that she put a piece of duct tape over C.W.'s mouth. S.C. was asked to describe the duct tape that she used. S.C. said that she could not remember because she used all different types of duct tape to make clothing out of. S.C. said that she knew it had a design on it.

85. S.C. was asked how she put the tape on C.W.'s mouth if C.W. was laying face down. S.C. said that C.W. was rolling over. S.C. also stated that she had used old clippers to shave part of C.W.'s head. S.C. was asked why she shaved C.W. S.C. said she did it to

embarrass C.W. S.C. was asked about the drawing on C.W.'s nipples. S.C. said that she used a marker to draw on them and she could not remember what she drew.

86. While C.W. was tied up, C.W. kept saying "I'm going to change, I am going to change". S.C. told C.W., if you haven't changed, you are not going to. S.C. opined that C.W. was talking about drugs. S.W. took a pillow and put it on C.W.'s face. S.C. said that C.W. was making mumbling sounds, and eventually quit moving.

87. S.W. got some plastic and put C.W. in the plastic. S.C. thought that S.W. got the plastic from his truck. S.W. put C.W. in the bed of his truck. S.C. and S.W. drove south to where they stopped. S.C. said it was dark when they left and she did not know where they were. S.C. said she did not know how far they drove, and that they drove on farm roads. S.C. said that S.W. got out of the truck and pulled C.W. out of the bed of the truck, and he dropped her into the canal. S.C. was asked if she got out of the truck. S.C. said if she did get out, she did not help S.W. move C.W. S.C. said that she was wearing sandals or thongs that night. S.C. and S.W. then drove back to S.C.'s apartment. S.C. said they did not talk about anything on the way back.

88. S.C. was asked about the cut marks on C.W.'s body. S.C. said she did not remember a knife used and never saw S.W. cut her. S.C. was also asked about the brass knuckles. S.C. said that the brass knuckles were not used.

89. While SA White was out of the vehicle, S.C. told C.I. Solano that she had hit C.W. with her fist on C.W.s' face while C.W. was on the ground.

90. On November 10, 2016, SA Keegan and Detective Schneider interviewed S.W., post Miranda warning, in an FBI vehicle outside S.C.'S apartment. S.W. stated that S.C. was mad at C.W. because C.W. had stole from S.W. S.W. stated that C.W. owed him money, and had previously stole articles from his house. S.W. advised that S.C. started stalking C.W. S.W. advised S.C. started calling people to find out where C.W. was located, and advised them that she was looking for her. S.W. also described that S.C. had also been driving around looking for C.W., and had taken some photographs of residences where she believed C.W. had been staying.

91. S.W. stated that the morning of C.W.'S murder, he had received a telephone call from A.A. advising that C.W. was at his house, and that C.W. needed a ride. S.W. stated that A.A. was aware that S.C. had been looking for C.W. S.W. stated he had told S.C. he was going to pick up C.W., and that S.C. stated she was going with him. S.W. advised that on the way to pick up C.W., S.C. told him that they were going to bring C.W. back to the apartment, tie her up, and search her for whatever drugs, or money they could find. S.W. stated S.C. had mentioned that she wanted to re-coup some of her losses. S.W. advised that he and S.C. drove to A.A.'S house in his brown truck. S.W. advised that C.W. voluntarily got into the back seat of the truck, and asked for a ride to the 100 Homes subdivision in Parker, Arizona.

92. S.W. advised he did not take C.W to the 100 Homes subdivision, but to S.C.'S apartment. S.W. initially stated that he had dropped S.C. and C.W. off at the apartment, and he thought they were going to get "high together." However, later after

being confronted with S.C.'S statement he advised that once the three of them had entered the apartment, he had gone back outside the apartment to grab some plastic zip ties from his truck. S.W. stated he went back inside the apartment, and S.C. said to tie her up. S.W. advised he grabbed C.W.'s arms and secured them behind her back with the zip ties. S.W. advised that C.W. did not resist. S.W. advised he then secured C.W.'S ankles together with another zip tie. S.W. then claimed that he had left the apartment and that when he last saw C.W. she did not have a scratch on her. S.W. stated there had been no one else in the apartment with S.C. and C.W. when he had left.

93. S.W. advised he returned to the apartment approximately four to six hours later, and he saw C.W. dead on the floor in the living room. S.W. advised that S.C. had been cleaning. S.W. began sobbing, and stated, "it was horrible." S.W. was asked to describe the condition of C.W.'S body. S.W. advised that C.W. was clothed, and that "part of her hair was missing." S.W. was asked how he knew that C.W. was dead. S.W. advised he had placed a mirror near her mouth and nose, and there was no evidence that C.W. had been breathing. S.W. claimed to not have seen any stab wounds on C.W.'S body. S.W. advised there had been no one else in the apartment when he had returned to the apartment.

94. S.W. was asked if he had asked S.C. what had happened. S.W. stated that S.C. admitted that she had killed C.W., but he does not recall her exact words. S.W. stated that S.C. acted like "it was nothing." S.W. advised he went out to his truck, and grabbed some plastic tarp. S.W. stated he wrapped C.W.'s body in the plastic tarp. S.W. advised he backed his truck up close to the front door of the apartment, and carried C.W.'S body

outside, and placed her in the bed of his pick-up truck. S.W. was confronted with the information that S.C. had stated he had suffocated C.W. with a pillow. S.W. denied that he suffocated C.W. with a pillow.

95. S.W advised that he, and S.C. then drove down into the valley, where he rolled C.W.'S body into the canal. S.W. denied sexually assaulting C.W., and stated she had been fully clothed when he had rolled her into the canal. S.W. stated that he thought S.C. was going to threaten C.W., and claimed that he did not know S.C. was going to kill C.W.

## III. Conclusion

96. Based upon the aforementioned information, your affiant submits that there is probable cause to believe that on or between March 8, 2016 and March 9, 2016, in the District of Arizona, within the confines of the Colorado River Indian Tribes Indian Reservation, Indian Country, the defendants, Sharon M. Clark and Jeffrey S. Williams, non-Indians, did with malice aforethought, unlawfully kill C.W., an Indian, in violation of Title 18, United States Code, Sections 1152, 1111 and 2.

**Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.**

Executed on: November 11, 2016 ______________________

Elliott M. White
Special Agent
Federal Bureau of Investigation

X
_________ Sworn by Telephone

Date/Time: November 11, 2016, at 10:02 a.m.

DEBORAH M. FINE
United States Magistrate Judge